IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| JESSE LEE HOPKINS, | CV 23–20–GF–JTJ |
| Plaintiff, | |
| vs. | ORDER |
| OFFICER CHILDERS, et al., | |
| Defendants. | |

Plaintiff Jesse Lee Hopkins ("Hopkins"), a prisoner proceeding without counsel, challenges the purported sexual assault and sexual harassment that occurred while he was incarcerated at the Cascade County Detention Center ("CCDC") in Great Falls, Montana, from April 7, 2023, to April 27, 2023, and the Defendants' alleged failure to protect him from the same. *See generally,* (Doc. 14.)  The Defendants seek summary judgment on the ground that no constitutional violations occurred and, alternatively, that Hopkins failed to exhaust his administrative remedies.  Defendants also assert that several of them are entitled to qualified immunity.  *See e.g.*, (Doc. 43 at 18-22.)

Because the undisputed facts show that Hopkins failed to administratively exhaust his claims and that no constitutional violations occurred, summary

1

judgment is granted in favor of the Defendants.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it impacts the outcome

of the case in accordance with governing substantive law.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  All reasonable inferences must be viewed in the light most favorable to

the nonmoving party.  *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014).

Nonetheless, the nonmoving party must identify, with some reasonable

particularity, the evidence that it believes precludes summary judgment.  *See Soto*

*v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (explaining that while pro se

parties are exempted from "*strict* compliance with the summary judgment rules,"

they are "not exempt[ed] . . . from *all* compliance," such as the requirement to

identify or submit competent evidence in support of their claims).[1]

## BACKGROUND

The following facts are undisputed unless otherwise noted, and viewed in

---

[1] The defendants' motions were accompanied by the requisite *Rand* Notice, (*see* Docs. 41 & 45), and Hopkins responded to the motion, (*see* Doc. 46). Hopkins failed, however, to comply with Fed. R. Civ. P. 56 and L.R. 56.1, by not filing a Statement of Disputed Facts.

the light most favorable to Hopkins, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

## I.    Factual Background

On April 7, 2023, Hopkins was booked into the CCDC and remained incarcerated there until April 27, 2023.  *See*, Paxton SUF (Doc. 39 at ¶¶1-2); *see also*, County Def's. SUF (Doc. 44 at ¶¶1-2.)  During this time period, Hopkins was a convicted and sentenced state prisoner and was awaiting sentencing on federal charges.  (Doc. 44 at ¶ 3.)

On April 8, 2023, Hopkins received and signed a Prison Rape Elimination Act ("PREA") Acknowledgment Form, which explained how inmates are to report sexual misconduct at the Detention Center, it also instructed that inmates are required to **immediately** report any sexual misconduct.  (Doc. 44 at ¶26.)  By signing the form, Hopkins acknowledged that he read and understood the reporting process. (Doc. 39 at ¶4.)  Hopkins also testified that sexual misconduct by a CCDC staff member could be reported through the Voices of Hope hotline to ensure confidentiality or by paper or kiosk kite, secure lock boxes, or by requesting to speak to detention or medical staff.  (*Id*. at ¶ 6.)

On April 18, Hopkins was assigned to a bunk in R pod, along with 3 other inmates.  (Doc. 39 at ¶ 8.)  Hopkins alleges that on this same day, Defendant Paxton, a CCDC correctional officer, sexually assaulted him by making him

perform oral sex on Paxton. (*Id*. at ¶9.) Hopkins alleged that the sexual assault

occurred after dinnertime, but prior to him going to sleep, at approximately 9:00

p.m. (*Id*. at ¶ 10.) Hopkins asserts the sexual assault occurred in the back of the

bunk room of R pod and lasted between 12 and 18 minutes. Hopkins states the

other two inmates in the R pod were sleeping in the dayroom, 20 to 30 feet away

from him, when the assault occurred. (*Id*. at ¶11.) Hopkins states Paxton was in

the bunk room of the R pod for 2 to 3 minutes, before he unzipped his pants,

presented his penis to Hopkins, and asked Hopkins to give him oral sex. Hopkins

believes he performed oral sex on Paxton for 10 to 15 minutes, at which point

Paxton ejaculated and the encounter concluded. Paxton zipped his pants up and left

the bunk room. (*Id*.)

On the evening of April 18, 2023, between 8:00 p.m. and midnight, CCDC

staff conducted four separate walk-throughs of the R pod; these walk-throughs

were recorded by a surveillance camera overlooking the dayroom of the R pod.

(*Id*. at ¶ 12.) Paxton conducted walk-throughs at 8:12 p.m. and 11:14 p.m. (*Id*. at

¶13.) The duration of Paxton's first walk-though was 23 seconds in length; he was

off camera in the bunk area for 10 seconds. (*Id*. at ¶17.) Paxton's second and final

walk-though at 11:14 p.m. lasted for 35 seconds, during which he was off camera

in the bunk area for 22 seconds. (*Id*. at ¶19.)

Inmate Jonathan Crouch was housed with Hopkins in R Pod beginning April

20, 2023; almost immediately Crouch began making sexual comments and trying

to show inmates, including Hopkins, his genitals.  (Doc. 44 at ¶¶ 5-6.)  That

evening, Crouch entered the back room of the pod, where Hopkins was on his

bunk, and made sexual suggestions to Hopkins and proceeded to touch Hopkin's

penis over a blanket and over Hopkins' clothing.  Hopkins pushed Crouch away.

(*Id.* at ¶7.)  Crouch left the area; Hopkins got out of bed and paced in the back

room, but eventually went to bed between midnight and 1:00 a.m.  Hopkins stayed

in bed for all of April 21st and part of April 22nd.  (*Id.* at ¶8.)  Hopkins got up for

dinner on the 22nd, and heard Crouch make another sexual comment.  Hopkins

reported the behavior, including Crouch's touching of his genitals, to the CCDC

staff.  (*Id.* at ¶9.)  Detention staff responded by immediately removing Hopkins

and Crouch from R pod and placing them in separate visiting booths.  (*Id.* at ¶10.)

Hopkins was interviewed by a Cascade County detective regarding the incident,

following which Hopkins was returned to R Pod and Crouch was not.  (*Id.* at ¶11.)

After his return to R pod, Hopkins was harassed by another inmate, Burshia,

about reporting Crouch to CCDC staff.  Hopkins reported Burshia's harassment to

CCDC staff, who initially did not remove him due to a lack of alternate placement.

(*Id.* at ¶¶12-13.)  Hopkins was then moved into a solitary cell in B Block within a

day of reporting Burshia's harassment.  He was not harmed by Burshia or any

other, nor was he involved in any physical altercations prior to being moved out of

R pod.  (*Id*. at ¶¶14-15.)  Hopkins alleges Defendants Childress, Combs, Osorio,

and Bahnmiller violated his Eighth Amendment rights by failing to immediately

remove him from R pod upon advisement that Burshia was harassing him; he

concedes he was not physically harmed prior to being moved to B block.  (*Id*. at ¶¶

16-17.)  Hopkins' therapist, Jacki Miller, recommended he be placed in R pod.  (*Id*.

at ¶18.)

Hopkins also alleges that during his time at CCDC, Defendant Pedersen, a

CCDC correctional officer, told Hopkins that his legs looked nice, his shorts were

tight, and he walked like a female.  Hopkins alleges Pedersen asked Hopkins if he

would ever have sex with him.  Hopkins acknowledges Pedersen's behavior was

verbal and never involved physical contact.  Hopkins did not report Pedersen's

alleged conduct to any CCDC staff, nor did he file a grievance related to the

conduct.  (*Id*. at ¶20-21.)  Hopkins alleges Defendants Slaughter, Van Dyken,

Bahnmiller, Grubb, Loomis, and Lenahan violated his rights because they were

supervisors responsible for the actions of their subordinates, although Hopkins also

acknowledges these Defendants were not aware the alleged violations were

happening and had no direct involvement in Pedersen's purported acts.  (*Id*. at

¶22.)

Upon his transfer from CCDC on April 27, 2023, Hopkins signed a PREA

Exit form in which he asserted that all instances of sexual abuse had been reported

to CCDC staff pursuant to the operative procedures.  (Doc 39 at ¶ 22.)  The only

PREA complaint Hopkins reported related to the purported sexual abuse and

harassment from other inmates. (*Id*. at ¶23.)  Both of these complaints against other

inmates occurred after April 18, 2023.  (*Id*. at ¶24.)  Following his PREA

complaints, Hopkins was interviewed by Detective Allison and Tri; he did not

report an allegation against Defendant Paxton.  Hopkins did not report Paxton's

alleged conduct to any CCDC staff, nor did he file a grievance related to the

conduct.  (*Id*. at ¶25.)  Similarly, Hopkins did not file a grievance regarding

Defendant Pedersen's behavior.  (Doc. 44 at ¶24.)  Hopkins was aware of the

grievance procedure.  Hopkins states that he asked for a grievance form, but staff

would not provide him with one.  (*Id*. at ¶25.)  Hopkins acknowledges he did not

ask for a form until he was preparing to leave CCDC, which was days, or possibly

weeks, following the incident with Pedersen.  (*Id*.)

On April 27, 2023, Hopkins was transferred back to the Yellowstone County

Detention Center

## II.    Procedural Background

On May 1, 2023, Hopkins filed his initial complaint.  (Doc. 1.)  The matter

was subsequently dismissed when Hopkins failed to file an amended complaint and

timely comply with the Court's order.  (Doc. 5.)  Hopkins sought reconsideration

of the dismissal, *see*, (Doc. 7); the matter was reopened, and Hopkins was directed

to file an amended complaint.  (Doc. 8.)  Hopkins then filed the operative

complaint in this Court, (Doc. 14), alleging the Defendants failed to protect him,

exhibited deliberate indifference during his incarceration, and subjected him to

cruel and unusual punishment.  (*Id*. at 6, 8-11, 13-19.)  As explained below, his

claims are defeated by the undisputed record.

ANALYSIS

Defendants assert that they are entitled to summary judgment on the grounds

that no constitutional violation occurred and that even if it did, Hopkins failed to

administratively exhaust his claims.  Defendants also assert qualified immunity.

Ultimately, the undisputed record shows Defendants were not deliberately

indifferent to Hopkins.  Nevertheless, because Hopkins must have properly

exhausted his claims to proceed here, *Jones v. Bock*, 549 U.S. 199, 216 (2007), the

defendants' exhaustion argument is addressed first below.

## I.     Exhaustion

The Prison Litigation Reform Act ("PLRA") prohibits any prisoner from

suing over prison conditions until he has first exhausted available administrative

remedies by completing a correctional facility's administrative review process

according to its rules.  *See* 42 U.S.C. § 1997e(a).  A defendant must prove the

inmate's failure to exhaust by showing "there was an available administrative

remedy, and that the prisoner did not exhaust that available remedy."  *Albino v.*

8

*Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). "[O]nce the defendant has carried that burden, the prisoner has the burden of production." *Id.* "That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

Hopkins does not claim that he failed to receive a copy of the CCDC's grievance policy or that he did not understand the procedure. In fact, as set forth above, Hopkins acknowledged that he was aware of the grievance policy, but that he chose not to grieve the alleged failure to protect, the alleged sexual harassment by Pedersen, and alleged sexual assault by Paxton. *See e.g*., (Doc. 39 at ¶25); (Doc. 44 at ¶¶ 24-25.) Moreover, the record demonstrates not only Hopkins' understanding of the grievance policy in place, but in fact that he utilized CCDC's procedures to report the conduct of inmates Crouch and Burshia.

Hopkins failed entirely to address the issue of exhaustion in his response to Defendants' summary judgment motions. *See generally*, (Doc. 46.) Hopkins did not submit a paper grievance or a kite via the CCDC's kiosk. Although aware of additional confidential reporting methods, including the Voices of Hope hotline, secure lock boxes, or speaking directly to a detention or medical staff member, Hopkins chose not to make any report.

Thus, the record demonstrates that Hopkins failed to exhaust his pending

9

claims under CCDC's administrative grievance process.  Thus, his claims are not properly before the Court.  Even if they were, however, they lack merit as discussed below.

## II.    Eighth Amendment: Sexual Assault/Sexual Harassment

Hopkins alleges he was sexually harassed by Defendant Pederson and sexually assaulted by Defendant Paxton.  Defendants are entitled to summary judgment on both of these claims.

The treatment a convicted prisoner receives while incarcerated and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.  *Helling v. McKinney*, 508 U.S. 25, 31 (1993).  The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids prison officials from "the unnecessary and wanton infliction of pain."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  When correctional officials stand accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or to maliciously and sadistically cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *Whitley*, 475 U.S. at 320-32.

Claims arising from sexual assault are distinct from Eighth Amendment excessive force claims.  *Bearchild v. Cobban*, 947 F. 3d 1130, 1144 (9th Cir. 2020).  "[S]exual assault serves no valid penological purpose," and thus, when an inmate

proves that a prison guard committed a sexual assault, there is a presumption that

the guard acted maliciously and sadistically for the very purpose of causing harm,

satisfying the subjective prong of an Eighth Amendment claim. *Id.*; *see also*,

*Wood v. Beauclair*, 692 F. 3d 1041, 1049 (9th Cir. 2012)(malicious and sadistic

intent may be presumed because there is no legitimate penological purpose for

sexual contact between prisoner and guard). "[A]n inmate need not prove that an

injury resulted from sexual assault" because "any sexual assault is objective

'repugnant to the conscience of mankind' and therefore not de minimis."

*Bearchild*, 947 F. 3d at 1144 (*quoting Hudson*, 503 U.S. at 10); *see also*, *Wood*,

692 F. 3d at 1050-51.

   "[A] prisoner presents a viable Eighth Amendment claim where he or she

proves that a prison staff member, acting under color of law and without legitimate

penological justification, touched the prisoner in a sexual manner or otherwise

engaged in sexual conduct for the staff member's own sexual gratification, or for

the purpose of humiliating, degrading, or demeaning the prisoner." *Bearchild*, 947

F. 3d at 1144. "[A]ll of the elements of a Section 1983 sexual assault claim are

established if a prisoner proves that a sexual assault occurred." *Id.* at 1145.

   Defendant Paxon states he did not sexually assault Hopkins and argues in his

motion for summary judgment that Hopkins fails to show that a sexual assault

occurred. *See*, (Doc. 38 at 5-9.) In support of his argument, Paxton relies

primarily on the video surveillance footage from the night of the alleged assault.

The Court has independently reviewed the footage and concurs that it supports

Paxton's position.

Paxton points out the glaring discrepancies between Hopkins' allegations of

what occurred/what he believes the video shows and what is actually documented

in the footage.  Hopkins asserted that after Paxton was in the R pod for two to three

minutes, he then unzipped his pants and directed Hopkins to perform oral sex upon

him.  Hopkins claims that he did so and that the encounter lasted between 10 and

15 minutes, at which point Hopkins ejaculated and left the pod.  Hopkins claims

that while he was alone in the back bunk area of the pod with Paxton, two of his

cell mates were sleeping in the day room.  The surveillance footage contradicts

each of Hopkins' contentions.

As set forth above, the video shows that Paxton was in R pod on two very

brief walk-throughs during the evening of April 18, 2023.  His first walk-though of

the pod at 8:12 p.m. lasted 20 seconds and Paxton was only off camera in the bunk

area for 10 seconds.  Paxton's second walk-through at 11:14 lasted a mere 35

seconds and Paxton was off camera for only 22 seconds.  Thus, Hopkins allegation

of a sexual assault that lasted between 10 and 15 minutes and began 2 to 3 minutes

after Paxton entered the pod, is simply impossible.

Hopkins concedes that while he may have misinterpreted the timeframe, the

fact that Paxton was off camera with him for any amount of time must demonstrate that Paxton engaged in sexual assault. (Doc. 46 at 1.) Hopkins argues that "even one minute" provided sufficient time for Paxton to "pull out his penis and make me perform oral sex." (*Id*. at 2.) The fact of the matter is, however, that Paxton was not alone with Hopkins for even a single minute; he was in the bunk area for 57 seconds total in his two visits to the pod.

Hopkins argues that there is no deposition from other inmates who were in the pod at the time of the purported assault that would support Paxton's denial of wrongdoing. (*Id*.) But Hopkins supposition about a non-existent deposition is not indicative of reasonable evidence that would preclude summary judgment. *See, Soto*, 882 F. 3d at 870. If anything, mentioning his cellmates highlights the fact that on the night in question there were not two, but three other individuals in the cell with Hopkins and, contrary to what Hopkins claims, the video shows that these individuals were not sleeping when Paxton walked through the cell on either occasion.

In short, Paxton has demonstrated that there is no genuine dispute as to any material fact. Hopkins has not shown that sexual assault occurred in violation of the Eighth Amendment.

Similarly, Defendant Pedersen is also entitled to judgment as a matter of law. Allegations of verbal harassment and abuse fail to state a claim cognizable

under 42 U.S.C. §1983.  *See Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997)

*overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85

(9th Cir. 2008); *see, e.g.*, *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996),

*amended* 135 F.3d 1318 (9th Cir. 1998) (disrespectful and assaultive comments by

prison guard not enough to implicate 8th Amendment). Mere verbal sexual

harassment does not necessarily amount to an Eighth Amendment violation. *Austin*

*v. Williams*, 367 F.3d 1167, 1171-72 (9th Cir. 2004) (upholding summary

judgment dismissal of 8th Amendment claim where prison guard exposed himself

to prisoner in elevated, glass-enclosed control booth for no more than 30-40

seconds). A prisoner therefore must establish that the alleged sexual harassment

was egregious, pervasive and/or widespread in order to state a claim under the

Eighth Amendment. *See*, *e.g.*, *Jordan v. Gardner*, 986 F.2d 1521, 1525-31 (9th

Cir. 1993); *Watson v. Jones*, 980 F.2d 1165, 1165-66 (8th Cir. 1992).

   Accepting Hopkins' allegations as true, he asserts that Pedersen told him his

shorts were tight, that he had nice legs, and that walked like a female.  Hopkins

also claims that Pedersen inquired if Hopkins would ever consider having sex with

him.  Pedersen argues that these comments are less offensive than what occurred in

*Austin*.  Because no Eight Amendment violation was found there, there cannot be

one in the instant case involving Pedersen's less egregious conduct.  *See*, (Doc. 43

at 15-16.)   Hopkins does not counter this argument with supplemental facts or law,

instead he simply asserts that Pederson was "in the wrong." (Doc. 46 at 2.)

While the Court is not condoning such statements and understands that they

may have upset Hopkins, the statements at most constitute verbal harassment.

Thus, there is no corresponding Eighth Amendment violation under the relevant

legal standards.

### III.    Failure to Protect and Supervisor Liability Claims

In his response Hopkins did not address the County Defendants' motion for

summary judgment relative to either of these claims. *See generally*, (Doc. 46.)

Nevertheless, the Defendants' motions are well-taken and summary judgment will

be granted.

### Failure to Protect

"Prison officials have a duty to take reasonable steps to protect inmates from

physical abuse." *Hoptowit v. Ray*, 682 F.2d 1237, 1250-51 (9th Cir. 1982); *see*

*also Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Robinson v. Prunty*, 249 F.3d

862, 866 (9th Cir. 2001). In particular, prison officials have an affirmative duty to

protect inmates from violence at the hands of other inmates. *Farmer*, 511 U.S. at

833. The failure of a prison official to protect inmates from attacks by other

inmates or from dangerous conditions at the prison violates the Eighth Amendment

only when two requirements are met: (1) the objective component—the

deprivation alleged must be sufficiently serious, and (2) the subjective

component—the prison official must possess a sufficiently culpable state of mind.

*Farmer*, 511 U.S. at 834 (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  To

meet the subjective component, a prisoner must establish that prison officials were

"deliberately indifferent" to serious threats to the inmate's safety.  *See Farmer*, 511

U.S. at 834.

Hopkins first alleges that Defendants violated his rights by failing to protect

him from sexual harassment by Crouch.  As set forth above, on the evening of

April 20, 2023, Hopkins alleges that Crouch made sexual comments and touched

his groin.  Hopkins did not immediately report the incident and proceeded to stay

in bed until dinnertime of April 22nd.  When Hopkins overheard Crouch making

additional sexual comments, he reported the behavior to CCDC staff.  Defendants

responded by removing both Hopkins and Crouch from R pod and separating them

while an investigation was performed.  Following the investigation, Hopkins was

returned to R pod and Crouch was not.  There is no indication that a County

Defendant knew of any risk of harm to Hopkins.  Moreover, once Hopkins

reported the situation, CCDC staff began an immediate investigation and took

reasonable steps to protect Hopkins.  Thus, no Defendant acted with deliberate

indifference by disregarding a threat to Hopkins' safety from Crouch.

Accordingly, there is no viable failure to protect violation at issue.

Hopkins also alleges Defendants Childers, Combs, Osorio, and Bahnmiller violated his rights by failing to separate him immediately from Burshia following Burshia's verbal threats.  Defendants argue that the claim fails both prongs of *Farmer*.  Specifically, that the verbal attacks made by Burshia did not constitute a deprivation sufficiently serious to constitute the unnecessary infliction of pain and, accordingly, no Eighth Amendment protection was triggered.  (Doc. 43 at 14.) Secondly, Defendants argue that Hopkins' allegations do not establish deliberate indifference, as he acknowledges the Defendants did not immediately have an alternative placement for him available.  (*Id*. at 14-15.)  Additionally, because there was no physical threat to Hopkins, there is no inference that Defendants were aware of a substantial risk of harm to Hopkins.  (*Id*. at 15.)  Defendants' position is well-taken.

From the facts as alleged by Hopkins, there was no existing "sufficiently serious" condition that presented a substantial risk of serious harm to Hopkins. *Farmer*, 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).  But even assuming that Hopkins could meet the first objective component of *Farmer*, he cannot show that any Defendant was deliberately indifferent to a threat to his safety.  *See Farmer*, 511 U.S. at 834.  Hopkins spoke to multiple CCDC officers about the issue, and within a day, once a space became available, Hopkins was moved and separated from Burshia.  Or put another way, Defendants responded

17

reasonably and, accordingly, cannot be liable for any purported failure to protect

Hopkins. *Farmer,* 511 U.S. at 844.  Defendants are entitled to summary judgment,

as a matter of law, on both failure to protect claims.

### Supervisory Liability

Pursuant to Section 1983, supervisory liability can be imposed if (1) the

supervisor was personally involved in the constitutional deprivation, or (2) there is

a sufficient causal connection between the supervisor's wrongful conduct and the

constitutional violation.  *Hansen v. Black*, 885 F. 2d 642, 646 (9th Cir. 1989).  "A

plaintiff may state a claim against a supervisor for deliberate indifference based

upon the supervisor's knowledge of and acquiescence in unconstitutional conduct

by his or her subordinates."  *Starr v. Baca*, 652 F. 3d 1202, 1207 (9th Cir. 2011).

Hopkins alleges that Defendants Slaughter, Van Dyken, Bahnmiller, Grubb,

Loomis, and Lenahan violated his rights because they were supervisors and,

therefore, were responsible for the actions of their subordinates.  *See e.g*., (Doc.

44-1 at 30-31.)  Hopkins testified that he had no information that these individuals

were personally involved in any of the things that happened to him, but rather he

theorizes that a supervisor is liable for the constitutional violations of anyone he or

she supervises.  (*Id*. at 32, 34, 35-37, 38-39.)  But Hopkins has not alleged, much

less provided any evidence, that any of these supervisors knew that their

subordinates were violating Hopkins' rights.  As pointed out by County

Defendants, Hopkins has also failed to show that any of the alleged constitutional violations were the result of a policy or practice instituted by Defendants Slaughter, Van Dyken, Bahnmiller, Grubb, Loomis, and Lenahan.  (Doc. 43 at 18.) Instead, these Defendants assert that Hopkins relies solely upon a theory of *respodeat superior* which is insufficient to establish liability in a Section 1983 matter.  (*Id.*)  County Defendants are correct.

A defendant cannot be held liable just because they supervise other employees.  Instead, supervising officers can be held liable under Section 1983 "only if they play an affirmative part in the alleged deprivation of constitutional rights."  *King v. Atiyeh*, 814 F. 2d 565, 568 (9th Cir. 1987)(*overruled on other grounds by Lacey v. Maricopa County*, 693 F. 3d 896 (9th Cir. 2012)).  Hopkins has failed to establish that any of the supervisory defendants had prior knowledge of unconstitutional conduct committed by their subordinates that that would give the supervisor notice of the need for changes.  *Howell v. Earl*, 2014 WL 2594235 (D. Mont. 2014) (*citing Starr*, 652 F.3d at 1208; *Dougherty v. City of Covina*, 654 F.3d 892, 900B01 (9th Cir. 2011)).  Similarly, Hopkins makes no mention of a policy implemented by the supervisory defendants in the instant matter, much less a "a specific policy" or "a specific event" implemented or instigated by them that led to the constitutional violations.  *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012).  Defendants are entitled to judgment as a matter of law relative to the

purported supervisory liability claim.

Because the Defendants were not deliberately indifferent to Hopkins and did

not violate his Eighth Amendment rights, the Court need not, and does not,

consider whether the defendants are entitled to qualified immunity.  *Saucier v.*

*Katz*, 533 U.S. 194, 202 (2001) (explaining that if the defendant's conduct did not

violate a constitutional right, further analysis is unnecessary).

**CONCLUSION**

Based on the foregoing, IT IS ORDERED that Defendants' motions for

summary judgment (Docs. 37 & 42) are GRANTED.

The Clerk of Court is directed to close this matter and enter judgment in

favor of Defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

The Clerk of Court is additionally directed to have the docket reflect that the

Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate

Procedure that any appeal of this decision would not be taken in good faith.  No

reasonable person could suppose an appeal would have merit.

DATED this 10th  day of July, 2025.


                                        */s/ John Johnston*
                                        John Johnston
                                        United States Magistrate Judge


20